UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
GOVERNMENT OF THE REPUBLIC OF SOUTH
AFRICA,

               Plaintiff,

     - against -

ISAAC SONSINO and ELLEN SONSINO,

               Defendants.
-----------------------------------------X
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

**MEMORANDUM AND
O R D E R**

10 Civ. 6554 (NRB)

     Plaintiff, the Government of the Republic of South Africa
("RSA"), brings this action against Isaac and Ellen Sonsino
("the Sonsinos"). Plaintiff alleges breach of contract and
violations of the New York General Obligations Law §7-103 ("NY
GOL § 7-103" or "§ 7-103") arising out of the Sonsinos' failure
to return a security deposit following the expiration of a
residential lease. Plaintiff also brings a cause of action for
attorney's fees pursuant to New York Real Property Law § 234
("NY RPL § 234" or "§ 234"). The Sonsinos deny the allegations
and assert five counterclaims. Before the Court is plaintiff's
motion for summary judgment on its three causes of action as
well as the Sonsinos' affirmative defenses and first and fourth
counterclaims. The first counterclaim alleges that RSA breached
an oral agreement to extend the term of the residential lease

1

for one year beyond the original lease term. The fourth counterclaim seeks declaratory relief stating that the oral renewal agreement, allegedly entered into in October 2008, is enforceable. For the following reasons, plaintiff's motion is granted as to its first two claims and defendants' counterclaims, but denied as to its third claim. Should defendants wish to pursue their remaining counterclaims,[1] they are directed to propose a schedule for concluding discovery and making any dispositive motions within ten days. In the meantime, we urge the parties to take this opportunity to resolve the issues remaining between them.

### FACTS

On February 2, 2007, RSA and the Sonsinos entered into a residential lease for an apartment in a condominium building in New York City. Pl.'s Statement of Material Facts ("Pl.'s SF") ¶ 4; Ex. E to Aff. of Peter Weideman in Supp. of Pl.'s Mot. for Partial Summ. J. ("Weideman Aff."). The term of the lease was to

---

[1] Defendants' second and third counterclaims arise out of allegations of property damage to the leased apartment caused by RSA, and their fifth counterclaim seeks attorney's fees. However, defendants admit that they did not complain of any damage until service of their amended answer in this action on November 22, 2010, nearly twenty months after RSA vacated the apartment. Defendants' Statement of Facts ("Defs.' SF") ¶ 38. This is despite the fact that both parties had retained counsel months earlier to exchange letters regarding the defendants' retention of the security deposit as a result of the purported lease extension. See Ex. L, M of Affidavit of Peter Weideman ("Weideman Aff."). Furthermore, the parties have represented to the Court at two separate conferences that the defendants no longer own the premises at issue. Given these facts, we question defendants' ability to sustain a claim for property damage.

2

expire on January 31, 2009. Pursuant to the lease, RSA would make monthly rental payments of $33,000 and provide the Sonsinos with a security deposit of $297,000.[2] SF ¶ 6. The security deposit was to be returned within 60 days of the expiration of the lease. Ex. E to Weideman Aff. at Lease Rider ¶ 1. However, the Sonsinos were entitled to "keep all or part of such Security Deposits to the extent necessary to pay [them] for any losses incurred as a result of [RSA's] failure to carry out any agreements...including the agreement to pay rent or other amounts due." Id. Furthermore, the lease rider contained specific clauses stating that RSA "acknowledges that no trust is created with respect to the Security Deposits, and the Security Deposits may be commingled with other funds of the [Sonsinos]," and that "[i]n no event shall [the Sonsinos] be obligated to pay interest with respect to the Security Deposits." Id.

Significantly, both the lease and the condominium's by-laws required that the lease and any amendments thereto must be approved by the Board of Managers of the condominium. Specifically, the lease provided that it could not be "modified[,] amended[,] extended[,] waived[,] or abrogated

---

[2] RSA was to provide $99,000 upon execution of the lease and, "in lieu of any waiver of diplomatic immunity" enjoyed by RSA, it was to "give the [Sonsinos] the additional sum of $198,000.00 upon execution of the Lease...as further security for the due and proper performance of all obligations...." Ex. E to Weideman Aff. at Lease Rider ¶ 1.

3

without the prior written consent of the Condominium," Ex E. to Weideman Aff. at ¶ 28(e), and that:

> "The Lease shall be subject and subordinate to (i) the Declaration of Condominium, (ii) the Rules and Regulations of the Condominium...and (iii) the By-Laws of the Condominium [(collectively, the "Condominium Documents")]. In the event of any inconsistency between the provisions of this Lease and the Condominium Documents, the provisions of the Condominium Documents shall govern and be binding."

Ex. E to Weideman Aff. ¶ 4.

Similarly, the condominium's by-laws mandate:

> "Any [rental] lease shall be consistent with these By-Laws and shall provide that it may not be modified, amended, extended or assigned, without the prior consent in writing of the Board of Managers."

Ex. F to Weideman Aff. art. VIII, Section 1.

The lease contained an option for RSA to extend the term for an additional year. The option provision stated that RSA could extend the term of the lease from February 1, 2009 to January 31, 2010, provided:

> "(i) [RSA gives the Sonsinos] notice (the "Extension Notice") in the manner required under this Lease of [RSA's] election to extend the term of the Lease, (ii) the Extension Notice must be given [to the Sonsinos] at least 180 days prior to the ending date of the Lease...and (iii) [RSA] may not be in default of any provisions of

> the Lease when the Extension Notice is given
> and on the commencement date of the
> Extension Term. If [RSA] fail[s] to send the
> Extension Notice to [the Sonsinos] by the
> date specified...this [provision] shall be
> of no further force and effect."[3]

Ex. E to Weideman Aff. ¶ 36(a).[4]

The provision further stated:

> "B. The monthly rate payable...during the
> Extension Term shall be...[5]
>
> C. All provisions of the Lease except as
> modified by this article 36 shall remain in
> full force and effect during the Extension
> Term."

Id. ¶ 36(b)-(c).

The parties agree that RSA did not exercise its option prior to the deadline. Pl.'s SF ¶ 12. Furthermore, at some point following August 4, 2008, the Sonsinos asked for and received permission to show the apartment to third parties who were interested in purchasing or renting the unit. Id. ¶ 21.

In October 2008, Peter Weideman, the Counselor to the Permanent Mission of the Republic of South Africa to the United Nations, and the individual who signed the initial lease on

---

[3] The Court has inserted an ellipsis between "specified" and "this" because the copy of the lease agreement submitted to the Court is illegible.

[4] 180 days prior to the expiration of the lease was August 4, 2008. Pl.'s SF ¶ 11.

[5] The figures or symbols listed here are illegible.

behalf of RSA, met in person with Isaac Sonsino to discuss the lease. Id. ¶ 23. The parties have different views as to what occurred at this meeting. According to the Sonsinos, Weideman and Isaac Sonsino reached a binding oral agreement to extend the lease for an additional year, through January 31, 2010, at a monthly rent of $37,000. The Sonsinos further claim that this oral agreement included an option to extend the lease for an additional year, from February 1, 2010 to January 31, 2011, a requirement that RSA purchase an insurance policy for the unit,[6] and a provision which stated that RSA would pay the condominium's common charges.[7] Affidavit of Isaac Sonsino in Opp'n to Mot. ("Sonsino Aff.") ¶¶ 18-19. In contrast, RSA contends that Weideman and Sonsino discussed an extension of the lease, but did not reach a binding agreement.

On October 30, 2008, an attorney for the Sonsinos emailed a draft of a lease amendment to Weideman. In the email attaching the amendment, the attorney wrote that he was "pleased to send you the attached amendment to the lease" and to "[p]lease direct any comments you may have to me…." Ex. G to Weideman Aff. In addition to extending the term of the lease for one year, the

---

[6] In the initial lease, the Sonsinos "procur[ed] and maintain[ed]" such a policy. Affidavit of Isaac Sonsino in Opp'n to Mot. ("Sonsino Aff.") ¶ 18.

[7] According to defendants, RSA was to pay the monthly common charges in lieu of the "substantial utility charges" that it paid under the initial lease. Id.

6

written amendment included the three modifications to the
initial lease detailed above. According to the Sonsinos, this
written lease amendment was intended to memorialize the binding
oral agreement that had already been reached.[8] Sonsino Aff. ¶ 20.
Weideman responded: "Thank you we will look at the draft and
come back to you." Id. As far as this Court is aware, there was
no further discussion between the parties with regard to this
draft.[9] At a minimum, it is undisputed that the draft was never
formally executed.

Defendants claim that around December 2008, Weideman
contacted Isaac Sonsino by telephone in order to request that
the Sonsinos "stop showing the Subject Premises to any third
parties inasmuch as Ambassador Sangqu was going to maintain his

---

[8] We note, however, that the written amendment makes no reference to the
previous oral agreement or the fact that it is simply a memorialization.

[9] According to RSA, Weideman did not have authority to bind the government to
a renewal agreement and thus forwarded the email exchange to the Department
of Foreign Affairs in Pretoria, which never granted approval. Weideman Aff. ¶
29. RSA does not specify whether approval was explicitly denied or the
officials in Pretoria simply never responded. RSA has not been able to locate
the email from Weideman, or any response thereto, during discovery in this
action. See Ex. 10 to Sonsino Aff. Defendants contend that if Weideman sent
an email to Pretoria, it is "not credible that neither the sender or
recipient has a copy." Mem. of Law in Opp'n to Mot. at 7. They suggest that
this Court could draw three potential inferences as to why the email has not
been produced in litigation. The first two posit that the email was sent, but
RSA has not produced it because it either did not elicit a response, which
demonstrates that Weideman had authority to enter the agreement himself, or
it received a response which is damaging to RSA's position. The third
possible inference is that the email cannot be recovered because it was never
sent. In defendants' view, this would demonstrate that Weideman had the
necessary authority to enter this agreement. As for why the Sonsinos never
followed up on the email exchange and written agreement, they contend that
they did not believe it was necessary since they had already reached a
binding oral agreement.

residence in the Subject Premises for another year."[10] Sonsino Aff. ¶ 23. However, according to the Sonsinos, Weideman called again in early January 2009 and informed them that "circumstances had suddenly changed" and RSA only wanted to remain in the apartment for two months beyond the original expiration date. Sonsino Aff. ¶ 24.

RSA neither confirms nor denies the alleged December 2008 and January 2009 communications from Weideman to the Sonsinos. The parties agree, however, that on January 17, 2009, Weideman emailed Isaac Sonsino with another proposed lease extension. Weideman's email stated: "Attached is a draft extension contract for your consideration. I tried to keep it as basic as possible. Kindly contact me if necessary." Ex. I to Weideman Aff. The proposal extended the term of the lease from February 1, 2009 to March 31, 2009 and set the monthly rental payments at $37,000. The proposal further stated that all the "terms and covenants, conditions and provisions contained in [the initial] lease are ratified and confirmed and remain in full force and effect." Ex. J to Weideman Aff. Isaac Sonsino did not respond to Weideman's

---

[10] Defendants argue that this contact by Weideman "clearly ratif[ied] the Renewal Agreement reached two months earlier." Sonsino Aff. ¶ 23. Of course, if the parties believed that they had reached a binding oral agreement in October 2008, there would be no need for Weideman to provide the Sonsinos with this information or request that they no longer show the apartment. Indeed, if the apartment was shown to potential purchasers or tenants between October and December, as this statement suggests, this fact would seriously discredit the Sonsinos' claim that the parties intended to reach a fully enforceable oral agreement to renew the lease in October.

email or execute the proposal. Sonsino Aff. ¶ 29. Once again, the Sonsinos claim that the lack of response was due to the preexisting agreement to extend the lease through January 31, 2010. Id.

When the initial lease term expired at the end of January 2009, RSA did not vacate the premises but instead tendered $37,000 as rent for the month of Febuary. RSA did the same at the beginning of March. In both instances, the Sonsinos accepted the money.[11] Id. ¶ 30. On March 4, 2009, Weideman wrote a letter to the Sonsinos in which he confirmed that RSA would no longer need the apartment and would vacate it by the end of March. He requested a date during the last week of March to do a "hand-over" of the apartment, and asked the Sonsinos to ensure that the $297,000 deposit would be reimbursed. Ex. K to Weideman Aff. Although the precise timing of what occurred next is not clear from the current record, at some point the Sonsinos informed RSA that it believed that the lease did not expire until January 31,

---

[11] According to RSA, the offer and acceptance of rent in the absence of a binding extension agreement created a month-to-month tenancy pursuant to NY Real Property Law § 232-c, which states:

> "Where a tenant whose term is longer than one month holds over after the expiration of such term...if the landlord shall accept rent for any period subsequent to the expiration of such term, then, unless an agreement either express or implied is made providing otherwise, the tenancy created by the acceptance of such rent shall be a tenancy from month to month commencing on the first day after the expiration of such term."

2010, and that they planned to retain the security deposit to compensate for any unpaid rent. On March 20, 2009, counsel for RSA sent a letter to the Sonsinos disputing this contention and pointing out that the Sonsinos were likely in violation of NY GOL § 7-103 as a result of their commingling of the security deposit with personal funds, among other things. Ex. L to Weideman Aff. In April 2009, the Sonsinos sought to cure any potential violation of § 7-103 by transferring the security deposit into a segregated account. Sonsino Aff. ¶ 35.

RSA vacated the apartment at the end of March. The parties were unable to amicably resolve their differences, and the instant suit was filed on September 3, 2010.

## DISCUSSION

A. <u>Legal Standard</u>

Summary judgment is appropriate only where the movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could

return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. Nat'l Union Fire Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks omitted)). It is thus insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (internal citations and quotation marks omitted). Further, while credibility determinations, weighing evidence, and drawing legitimate inferences from facts are functions that the court must leave to the jury, if the nonmoving party does not present evidence from which a reasonable jury could return a favorable

11

verdict, then summary judgment is appropriate. See, e.g., <u>Golden</u> <u>Pac. Bancorp. v. F.D.I.C.</u>, 375 F.3d 196, 200 (2d Cir. 2004).


B. <u>Count 1: Breach of Contract</u>

Plaintiff's first cause of action alleges that the Sonsinos breached the parties' lease agreement by failing to return the security deposit within 60 days. In response, the Sonsinos assert a number of affirmative defenses. The dispositive issue, however, is whether the parties entered into an enforceable oral agreement to extend the term of the lease from February 1, 2009 to January 31, 2010. If an agreement was reached, the Sonsinos are not in breach of contract. If not, the affirmative defenses are meritless and summary judgment must be granted.

While we believe that this case could present an instance in which summary judgment on the question of intent to be bound in the absence of a written agreement is proper, we recognize that it is a close question. Ultimately, we find it is unnecessary to engage in the rigorous analysis this question would otherwise deserve.[12] Assuming <u>arguendo</u> that Weideman and

---

[12] In this Circuit, the issue of whether a party intends to be bound absent a written agreement is a question of fact "to be presented for resolution to the factfinder at trial." <u>Consarc Corp. v. Marine Midland Bank, N.A.</u>, 996 F.2d 568, 576 (2d Cir. 1993). Summary judgment in favor of the party claiming that there was no binding oral agreement is only appropriate where there is "uncontroverted objective signs evincing an intent not to be bound." <u>Id.</u> In determining whether parties have demonstrated an intent not to be bound absent a writing, courts evaluate many potential factors. <u>Id.</u> at 575-576

Isaac Sonsino intended to reach a binding oral agreement in October 2008, the agreement is not enforceable because it was never approved by the Board of Managers of the condominium. Since there was no enforceable agreement to extend the term of the lease, RSA did not improperly vacate the premises prior to the expiration of its lease term. Therefore, the Sonsinos were not justified in retaining the security deposit and summary judgment must be granted.[13]

The Sonsinos argue that the oral renewal agreement was approved by the board because "in approving the [initial lease] which contained an option for an additional year, [the board] had already approved the extension of the lease term for another year." Mem. of Law in Opp'n to Mot. at 10. As a result of the

_____

(identifying sixteen "common factors relied on in determining intent" and noting that the list is not "exhaustive"). However, four factors play a particularly significant role: "(1) whether a party made an express reservation of the right not to be bound in the absence of a signed writing, (2) whether there has been partial performance, accepted by the party disclaiming the contract, (3) whether all of the terms of the alleged contract have been agreed upon, and (4) whether the agreement is the type of contract that usually is committed to writing." Stein v. Gelfand, 476 F. Supp. 2d 427, 432 (S.D.N.Y. 2007) (citing R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75-76 (2d Cir. 1984)).

[13] The Sonsinos argue that if we find that the oral renewal agreement is not enforceable because of a failure to obtain board approval, we must similarly find that RSA was not a month-to-month tenant pursuant to New York law since the board never agreed to such a tenancy either. However, the month-to-month tenancy is a creation of state law resulting from the acceptance of proffered rent and there is no provision in the Condominium's by-laws even suggesting that it could override statutory law. In any event, even if the month-to-month tenancy was in violation of the rules of the condominium, the Sonsinos do not articulate any reason why such an arrangement would justify their retention of the entire security deposit. Indeed, is the Sonsinos that are obligated to follow the by-laws of the Condominium. They cannot rely on their failure to obtain approval from the Board as a justification for retaining plaintiffs' money.

approval of this option, the defendants argue, "[f]urther consent was not necessary." Id.

This argument is unavailing. While the board did approve an option to renew the lease, the extension allegedly agreed to by Weideman and Isaac Sonsino in October 2008 was not a valid exercise of this option. As noted above, the option established by the lease had to be exercised by August 4, 2008. Ex. E to Weideman Aff. ¶ 36(a). Since RSA indisputably "failed to *send* the Extension Notice" to the Sonsinos by that date, the option was "of no further force or effect." Id. (emphasis added).[14] Thus, the oral agreement allegedly entered into in October 2008 could not have been an exercise of the option, since the option itself was no longer part of the lease.

Furthermore, the alleged oral agreement of October 2008 modified the original lease in several material ways. As described above, it granted a new option for an additional year, obligated RSA to pay the condominium's common charges, and required RSA to obtain insurance.[15] The extension provision in

---

[14] We note that the language of the option provision refers to "sending" notice. This could reflect that the parties did not contemplate the possibility of an oral agreement to exercise the option.

[15] These would have been significant obligations. The common charges for February 1, 2009 through January 31, 2010 ultimately totaled $34,825.39. This is in contrast to the $9,667.57 that RSA paid for electricity in 2007 and 2008 combined. Ex. F to Wedeiman Aff. in Reply. As for an insurance policy, while we do not know what the precise cost would have been, it is obviously material given that RSA did not have to obtain any policy under the original lease agreement.

the initial lease, which was approved by the board, specified that all "provisions of the Lease except as modified by this [extension provision] shall remain in full force and effect during the Extension Term." Ex. E to Weideman Aff. ¶ 36(c). Thus, even if there was some basis for finding that the Sonsinos and RSA could unilaterally revive the expired option clause without the consent of the Board of Managers, this agreement could not be a legitimate exercise of the option since it sought to modify the initial lease without the approval of the board.

Regardless of the intentions of RSA and the Sonsinos in October 2008, no agreement to extend the lease was approved by the condominium, and the alleged oral contract was not an exercise of the previously approved option year. Therefore, there was no enforceable extension of the rental agreement, and the Sonsinos were not justified in retaining the security deposit.

C. Count 2: Violation of NY GOL § 7-103

NY GOL § 7-103 states, in pertinent part:

> "1. Whenever money shall be deposited or advanced on a contract or license agreement for the use or rental of real property as security for performance of the contract or agreement or to be applied to payments upon such contract or agreement when due, such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit or advance and shall be

> held in trust by the person with whom such
> deposit or advance shall be made and shall
> not be mingled with the personal moneys or
> become an asset of the person receiving the
> same...
>
> 2. Whenever the person receiving money so
> deposited or advanced shall deposit such
> money in a banking organization, such person
> shall thereupon notify in writing each of
> the persons making such security deposit or
> advance, giving the name and address of the
> banking organization in which the deposit of
> security money is made, and the amount of
> such deposit....
>
> 2-a. Whenever the money so deposited or
> advanced is for the rental of property
> containing six or more family dwelling
> units, the person receiving such money
> shall...deposit it in an interest bearing
> account...
>
> ...
>
> 3. Any provision of such a contract or
> agreement whereby a person who so deposits
> or advances money waives any provision of
> this section is absolutely void."

RSA alleges four separate violations of NY GOL § 7-103. Specifically, plaintiff claims that the Sonsinos (1) commingled the security deposit with other funds; (2) failed to place the security deposit in an interest bearing account; (3) did not provide RSA with written notice of the name and address of the banking institution where the security deposit was held; and (4) included lease provisions contrary to § 7-103.

16

The Sonsinos do not dispute that upon receiving the security deposit from RSA, they commingled it with their personal property by placing the funds in their own bank account. Defendants' Statement of Material Facts ("Defs.' SF") ¶ 15. They further concede that the security deposit was not placed in a segregated, interest bearing account until April 2009 and that they never provided RSA with written notice of the name and location of the banking institution in which the funds were held. Id. ¶¶ 16-17. However, defendants make several arguments as to why they are not liable for these actions. We address these contentions in order.

1. Application of § 7-103 to RSA

Defendants first argue that § 7-103 does not apply when the tenant is a governmental entity. As defendants point out, the language of § 7-103 only refers to the "person" providing (or receiving) the deposit. Defendants claim that since "person" is not defined in the statute, it should be given its ordinary meaning, which does not encompass governmental entities. Defendants cite to recent Supreme Court case law as well as Black's Law Dictionary for these propositions. See FCC v. AT&T, Inc., 131 S.Ct. 1177, 1182 (2011) ("When a statute does not define a term, we typically give the phrase its ordinary meaning.") (internal quotation omitted); Black's Law Dictionary

1257-58 (9th ed. 2009) (defining "person" as "a human being,"
the "living body of a human being," or an "entity (such as a
corporation) that is recognized by law as having most of the
rights and duties of a human being...In this sense, the term
includes partnerships and other associations, whether
incorporated or unincorporated"). Defendants also quote a 1979
case from the New York Supreme Court, Appellate Division, Fourth
Department in a different context for the proposition that the
word "'person' does not in its ordinary or legal signification
embrace a State or government." Towner v. Jimerson, 67 A.D.2d
817, 413 N.Y.S.2d 56, 58 (4th Dep't 1979). As far as we are
aware, the applicability of § 7-103 to governmental tenants or
landlords is a question of first impression in any proceeding
applying New York state law.

While defendants raise a novel question of law, we cannot
endorse their view that § 7-103 does not apply to governments.
Several considerations lead us to this conclusion. First, we
note that defendants omit the passage that their own source,
Black's Law Dictionary, quotes in order to explain how it
arrived at the definition of "person" detailed above:

> "So far as legal theory is concerned, a
> person is any being whom the law regards as
> capable of rights and duties. Any being that
> is so capable is a person, whether a human
> being or not, and no being that is not so
> capable is a person, even though he be a

> man. Persons are the substances of which
> rights and duties are the attributes. It is
> only in this respect that persons possess
> juridical significance, and this is the
> exclusive point of view from which
> personality receives legal recognition."

Id. (quoting John Salmond, Jurisprudence 318 (Glanville L. Williams ed., 10th ed. 1947). We do not believe that this definition necessarily excludes a governmental entity.

Furthermore, defendants do not cite to a single case involving § 7-103 to support their argument that the provision does not apply to governments, and our own review of relevant case law provides no support for their position. Indeed, we have not encountered a case in which a court has even considered the identity of the tenant seeking to enforce § 7-103. See, e.g., Tappan Golf Drive Range, Inc. v. Tappan Prop., Inc., 68 A.D.3d 440, 889 N.Y.S.2d 580, 581 (1st Dep't 2009) (applying § 7-103 in a case involving corporation[16] without any discussion of whether § 7-103 applies to entities other than natural persons); see also Whittington v. United States Dep't of Hous. and Urban Dev., et al., No. 80 Civ. 6381 (HFW), 1982 U.S. Dist. LEXIS 10922 (S.D.N.Y. Jan. 6, 1982) (assuming arguendo that § 7-103 applies to federal agency as landlord but holding that the agency was

---

[16] We do not imply that simply because corporations are considered a "person" under § 7-103, a governmental entity must be as well. Rather, we cite this case as an example of New York courts applying § 7-103 whenever the rights of tenants are at stake, without any consideration of the tenant seeking the court's assistance.

19

not liable under the statute since the deposits at issue had been provided to the previous landlord and the agency only acquired the property upon default of an agency-insured loan). In fact, when discussing § 7-103, courts typically refer to "tenants," and often appear oblivious to the fact that § 7-103's language actually refers to "persons." <u>See</u>, <u>e.g.</u>, <u>Tappan Golf Drive Range, Inc.</u>, 889 N.Y.S.2d at 581; <u>see also</u> <u>Pollack v. Springer</u>, 91 N.Y.S.2d 847, 849 (Civ. Ct. 1949) (holding that predecessor statute of § 7-103, which also referred to "persons" making or receiving a deposit, was "for the protection of all tenants" and that the "landlord" was liable for commingling of funds even where "tenant" had breached the lease). We recognize the limitations in relying on this case law, given that no case has squarely addressed the issue presented here or held that § 7-103 applies to a governmental entity. However, we find it telling that in nearly half a century since § 7-103's first enactment and over seventy-five years since its principles first became law,[17] not a single case supports defendants' position or even addresses the meaning of "persons" under the statute.

---

[17] The New York legislature first enacted § 7-103 in 1963. However, the most significant provisions, specifically that the money remains the property of the tenant and that commingling of funds is forbidden, were added to the Real Property Law in 1935. <u>See</u> <u>Sommers v. Timely Toys, Inc.</u>, 110 F. Supp. 844, 846-47 (S.D.N.Y. 1953) (discussing § 233 of the Real Property Law, the predecessor of § 7-103, and collecting cases for the proposition that New York courts have "interpreted the [law] to mean what it says" and have held that "the sum deposited as security is the property of the tenant, and as to

Similarly, a cursory review of available legislative history does not reflect a specific intention to exclude certain tenants from § 7-103's scope by using the term "persons." In fact, memoranda issued in connection with legislation amending § 7-103 have extolled the protections that § 7-103 provides for "tenants."[18] These statements do not address what types of tenants are protected by the statute, and do not in any way imply that certain tenants were meant to be excluded. Given the

---

it, the relationship between the parties is not that of debtor and creditor, but by operation of law the landlord is a trustee for the tenant"), appeal dismissed 209 F.2d 342 (2d Cir. 1954). Notably, Real Property Law § 233 also referred to the "persons" making or receiving a security deposit.

[18] In 1970, § 7-103 was amended to add the requirement that landlords in buildings with six or more dwelling units place the deposits in interest-bearing accounts and to authorize landlords to retain a fee of 1% of the amount deposited in order to cover administration expenses. In connection with this amendment, the Attorney General issued a memorandum in which he referred interchangeably to "persons" and "tenants," but did not evince an intent to exclude any tenants from the law's coverage. Memorandum of Attorney General, reprinted in New York State Legislative Annual, 1970, p. 300. Furthermore, the Governor, in his memorandum issued in connection with signing the legislation, explicitly referred to the law's protection of "tenants" and made no mention of "persons." Memorandum of Governor, reprinted in New York State Legislative Annual, 1970, p. 538. Similarly, in 1979 the statute was amended to require that landlords place the interest-bearing accounts in a banking institution located within the state of New York. In a memorandum of Senator Norman J. Levy, he asserted that the legislation was necessary because "tenants" had often been frustrated in their efforts to execute a judgment obtained against "landlords" in Small Claims Court because "landlords" had been placing the funds in accounts outside of the state of New York. He did not refer to "persons" or otherwise condition the tenants that would enjoy the law's protection. Memorandum of Sen. Norman J. Levy, reprinted in New York State Legislative Annual, 1979, p. 234. Lastly, in the past year at least two New York Senators have introduced legislation which would amend § 7-103 in order to ensure that "tenants" receive a greater share of the interest accrued on their deposits. The statements supporting these proposed bills in no way suggest that it would not apply to every tenant. Memorandum of Sen. Carl Kruger in support of S387-2011, available at http://m.nysenate.gov/legislation/bill/S387-2011 (last visited Sept. 13, 2011); Memorandum of Sen. George D. Maziarz in support of S272-2011, available at http://m.nysenate.gov/legislation/bill/S272-2011 (last visited Sept. 13, 2011).

clear intention of the New York state legislature to protect tenants from unscrupulous landlords, we simply cannot conclude that it did not intend § 7-103 to apply to tenants who happen to be governmental entities. New York is home to the United Nations and countless diplomatic missions and embassies, as well as an abundance of governmental agencies and departments. It would be remarkable if the legislature deliberately excluded a large set of potential tenants (and landlords) from this law without providing any indication of such an intent. As detailed above, such evidence is lacking.

In short, having found nothing in the legislative history or applicable case law which suggests that the legislature intended to limit the scope of § 7-103 by referring to "persons," rather than simply using that term because it understood that most tenants would be persons or other entities traditionally considered as "persons" under the law, we are disinclined to adopt defendants' reading.

Lastly, we find it significant that the Sonsinos themselves assumed that the requirements of § 7-103 applied to the lease with RSA and therefore sought a waiver of those requirements. Isaac Sonsino testified that he "believed that [the agreement to allow commingling] was negotiated and agreed to in good faith, and...relied on it when [the Sonsinos] received the Security

22

Deposit and deposited the funds with [their] own funds." Sonsino Aff. ¶ 13. Even in this litigation, defendants rely on the statute to argue that these lease provisions were included "to compensate for [RSA's] advantages in refusing to waive sovereign immunity" and that, because of RSA's immunity, a "contractual provision waiving [§ 7-103's] rights was necessary." Defs.' Mem of Law in Opp'n to Mot. at 13. Obviously, such a position would make little sense if defendants truly believed that § 7-103 did not apply to the lease with RSA.[19] Of course, we recognize that a party could be uncertain about a law's applicability and therefore decide to contractually address the issue in order to erase any doubt. Likewise, a party could think that a law applies to a certain scenario only to discover at a later date, perhaps after litigation has been initiated, that it does not. Nevertheless, we find it instructive that the Sonsinos assumed that the requirements of § 7-103 applied to the lease agreement and that, even in this litigation, they maintain that a waiver

---

[19] Even assuming defendants believed § 7-103 applied in the absence of the lease provision, this argument is deficient. The Sonsinos obtained a very large security deposit (nine months' rent) because RSA's immunity would have made it difficult, if not impossible, to recover for a breach of the lease. There does not appear to be any explanation as to why, in addition to having this large sum placed in a trust, the Sonsinos also needed to commingle the funds with their personal property in order to protect against a potential default. Furthermore, inasmuch as defendants rely on RSA's immunity to support their claim that § 7-103 should not apply to governments, this argument is belied by the fact that not all governmental entities are immune. If the legislature had intended to exclude certain governments from coverage because of their immunity status, as the Sonsinos might be suggesting, it is fair to assume that the statute would have explicitly so stated.

of these rights was "necessary" in order to protect their interests.[20]

     2.   <u>Implied Covenant of Good Faith</u>

Defendants next argue that if § 7-103 applies to this lease, RSA should not be permitted to enforce the statute against them because of the implied covenant of good faith and fair dealing. According to defendants, RSA "acted in bad faith by expressly agreeing to provisions in the [lease] that, among other things, permitted [the Sonsinos] to commingle the Security Deposit, and then turning around and using those very same provisions against Defendants in order to frustrate a provision intended to compensate for its advantages in refusing to waive sovereign immunity." Defs.' Mem of Law in Opp'n to Mot. at 13.

Once again, defendants' contention is provocative but unpersuasive. Whether or not it appears "fair" as applied in this particular case, the fact is that § 7-103(3) expressly states that "[a]ny provision of...a contract or agreement whereby a person...waives any provision of this section is absolutely void." The nonwaivable nature of the requirements of § 7-103 is enforced by New York state courts. <u>See</u>, <u>e.g.</u>, <u>Tappan Golf Drive Range, Inc. v. Tappan Prop., Inc.</u>, 68 A.D.3d 440, 889

---

[20] We note that while the Sonsinos, who were represented by counsel, were well-aware of § 7-103's affirmative obligations, they simultaneously ignored the statutory provision that agreements to waive those obligations are invalid.

N.Y.S.2d 580, 581 (1st Dep't 2009) (lease provision "purporting to grant defendant the right to commingle the security deposit" upon maturation of a certificate of deposit was "'absolutely void' under the statute" because § 7-103 "cannot be waived"). Notably, in arguing that RSA violated the implied covenant of good faith, defendants do not cite a single case in which a court has held that a tenant that has agreed to waive the requirements of § 7-103 cannot sue for violations of the statute. Indeed, all of their citations on this point are to cases unrelated to § 7-103.

Adopting defendants' view that a party which contractually agrees to waive the provisions of § 7-103 cannot sue for failure to comply with those provisions would essentially eliminate the statutory clause providing that such waivers are "absolutely void." We cannot justify such a holding. NY GOL § 7-103 expressly voids the contractual term which provided that the Sonsinos could commingle the security deposit. As a result, we must read the lease agreement as if the waiver did not exist. This leaves us with the obligations of § 7-103, which the Sonsinos neglected.

### 3. Violation of § 7-103(2-a)

Defendant's next argument pertains solely to § 7-103(2-a), which requires that security deposits "for the rental of

property containing six or more family dwelling units" must be placed "in an interest bearing account in a banking organization within the state." Defendants claim that this provision should not apply to the Sonsinos, since they did not own six units in the "property," or condominium. For this proposition, defendants cite a 2010 case from the New York Supreme Court, which held:

> Here, the apartment that plaintiff rented is owned by [defendant] in fee simple, and it is undisputed that [defendant] owns no other portion of the Building, in which all dwelling units --and there are more than six-- are condominium units. [Defendant] argues that it was not required to deposit plaintiff's rental deposit in an interest-bearing account, because GOL § 7-103 (2-a) was intended to apply solely to owners of buildings containing six or more rental units. This interpretation is reasonable, albeit inconsistent with that in the opinion circulated by the Attorney General in 1970. At that time, fee ownership of individual apartments was not common in New York. The exclusion of properties with five or fewer family dwellings from application of GOL § 7-103 (2-a) is consistent with the notion that it does not impose the burden of requiring the landlord to keep the security deposit in a separate interest-bearing account upon the fee owner of only a single unit, just as it clearly does not apply to the fee owner of a single-family home.
>
> Inasmuch as plaintiff's security deposit is not within the ambit of GOL § 7-103 (2-a), [defendant] was not obligated to place plaintiff's deposit in an interest-bearing account.

Pritzker v. Park South Lofts LLC, 920 N.Y.S.2d 243 (Sup. Ct. 2010).

In its reply memorandum, RSA does not respond to this argument. Given that RSA appears to have abandoned this claim, and that the view of the New York Supreme Court is persuasive, we accept defendants' assertion that they did not violate § 7-103(2-a) by failing to place the deposit in an interest bearing account.

### 4. Defendants Cured All Violations of § 7-103

Finally, defendants argue that any potential violations of § 7-103 were cured prior to the expiration of the lease. It is true that "[w]here the lease continues, a prior commingling since corrected does not forfeit the security." Shandwick USA v. Exenet Techs., Inc., 744 N.Y.S.2d 640, 642 (Civ. Ct. 2002) (quoting Sommers v. Timely Toys, 209 F.2d 342, 343 (2d Cir. 1954)). In this case, the Sonsinos claim that the curative measures occurred in April 2009. Thus, the issue of whether defendants adequately cured their violations depends on when the lease is deemed to have ended. As discussed above, there was no agreement to extend the lease beyond, at the latest, March 2009. Therefore, defendants could not cure their violations by establishing a separate account for the security deposit in April 2009. Furthermore, even if we were to credit defendants' curative measures because they occurred prior to the completion

of trial in this action,[21] which we are not inclined to do, it does not appear that they have properly cured their violations in any event.[22]

D. Count 3: Attorney's Fees

New York Real Property Law provides:

> "Whenever a lease of residential property shall provide that in any action or summary proceeding the landlord may recover attorneys' fees and/or expenses incurred as a result of the failure of the tenant to perform any covenant or agreement contained in such lease...there shall be implied in such lease a covenant by the landlord to pay to the tenant the reasonable attorney's fees and/or expenses incurred by the tenant as the result of the failure of the landlord to perform any covenant or agreement on its part to be performed under the lease or in

---

[21] Defendants cite a case from the New York Supreme Court, Appellate Division, First Department from 1954 for the proposition that a landlord is not liable for a "technical conversion" arising out of a failure to deposit funds in a separate account where the "evidence discloses that the deposit was intact and before the conclusion of the trial had been put in a special account." Bridge Hardware Co. v. Mayer, 131 N.Y.S.2d 823, 824 (1st Dep't 1954). Thus, they argue that their curative steps in April 2009 should be credited even if the lease had already expired. However, more recent cases have only considered whether the lease was ongoing at the time of the curative measures. See, e.g., Shandwick USA, 744 N.Y.S.2d at 642. Furthermore, Bridge Hardware is distinguishable because in that case the tenant maintained possession of the premises throughout the legal proceedings and the security deposit remained intact. Indeed, courts interpreting the rule of Bridge Hardware have limited its scope to only apply in cases which present both of those facts. See Purfield v. Kathrane, 341 N.Y.S. 2d 376, 383 (Civ. Ct. 1973) ("Where at the time of trial the deposit was intact and the person making the deposit was in possession, it has been decided that, despite such commingling, there is no conversion and, consequently, there can be no recovery of the deposit...However, in the absence of these conditions, the commingling constitutes a conversation....").

[22] According to the exhibits submitted to the Court, it appears that defendants have placed the deposit in a "pledged collateral account" in Ellen Sonsino's name, rather than a segregated trust account benefiting RSA. See Ex. O to Weideman Aff.

28

> the successful defense of any action or
> summary proceeding commenced by the landlord
> against the tenant arising out of the
> lease."

NY RPL § 234.

The lease between RSA and the Sonsinos contained a provision granting the Sonsinos attorney's fees in the event that RSA defaulted under the lease. Therefore, under normal circumstances NY RPL § 234 would apply and RSA would be entitled to attorney's fees in this action.[23] However, given that RSA refused to waive its sovereign immunity upon entering the lease agreement, we do not believe it would necessarily be appropriate to grant attorney's fees. The "purpose of Real Property Law § 234...is to create equality, i.e., 'to balance the rights of landlord and tenant in the context of what had been the standard attorney's fee provision contained in the standard form lease.'" Scotia Associates v. Bond, 484 N.Y.S.2d 479, 483 (Civ. Ct. 1985) (quoting College Props. v. Bruce, 473 N.Y.S.2d 906, 908 (Civ. Ct. 1984)). In this case, while the lease contained the standard attorney's fee provision in favor of the landlord, it was largely meaningless given that the landlord could not have obtained a judgment against the tenant. Unlike § 7-103, it would be perverse to allow an immune plaintiff to take advantage of

---

[23] The Sonsinos do not make any arguments regarding their liability for attorney's fees beyond their assertion that since there was an oral lease extension, they are not in breach of contract or NY GOL § 7-103 and therefore are not liable for attorney's fees.

the protections offered by this statute. Thus, summary judgment is denied.[24]

## CONCLUSION

For the aforementioned reasons, plaintiff's motion for summary judgment is granted as to its claims of breach of contract and violations of NY GOL § 7-103 and defendants' counterclaims pertaining to the alleged oral lease extension. It is denied with respect to the count seeking attorney's fees. Defendants are ordered to notify the Court within ten days as to their intentions regarding the remaining counterclaims which are not the subject of this motion.

The Clerk is hereby directed to close this motion on the docket of the Court as all issues raised by the motion have been decided.

**SO ORDERED.**

Dated:      New York, New York
            September 16, 2011

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[24] While we deny the motion for summary judgment, we do not dismiss plaintiffs' claim of attorney's fees as we can envision a scenario wherein defendants' attempt to recover attorney's fees might result in our permitting plaintiff to seek attorney's fees.

Copies of the foregoing Order have been mailed on this date to the following:

**Attorney for Plaintiff**
Michael Barrie Kramer, Esq.
Michael B. Kramer & Associates
150 East 58th Street
New York, NY 10155

**Attorneys for Defendants**
Mitchell Jared Flachner, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016